# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JOHN D. HERRERA,

      Plaintiff,

v.                                        CIV No. 01-782 JP/LFG

DAVID GRIEGO, et al.,

      Defendants

## MAGISTRATE JUDGE'S ANALYSIS
## AND RECOMMENDED DISPOSITION[1]

This is a *pro se, in forma pauperis* civil rights action brought under 42 U.S.C. §§ 1983, 1985 and 1986. Plaintiff John D. Herrera ("Herrera") currently is incarcerated at the Guadalupe County Correctional Facility ("GCCF") and brings this lawsuit against David Griego (warden of programs), Janet Bravo (classification director), and Paula Haight, (Herrera's case manager as of May 2001), as well as still unnamed officers or employees of the State. All of Herrera's constitutional and state tort claims concern Defendants' decision to restrict the type of visit Herrera was permitted to have with his three minor sons. Instead of continuing to grant Herrera extended, unsupervised visits (also known as "family visits") in a trailer with his sons, as of June 2001, Defendants permitted him to have

---

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

only supervised, regular or "contact" visits (permitting some touching between visitors and inmate) in the GCCF visitation rooms. Herrera alleges that this change in family visitation privileges violates his Due Process rights under the Fourteenth Amendment, constitutes an unlawful seizure under the Fourth Amendment, subjects him to cruel and unusual punishment under the Eighth Amendment and is violative of his Equal Protection rights. He also brings conspiracy claims under §§ 1985 and 1986, and asserts claims of supervisory/ manager liability and intentional infliction of emotional distress.

On December 21, 2001, the Court ordered Defendants to submit a Martinez Report[2] addressing certain matters alleged in Herrera's complaint. The parties were notified that the Martinez Report could be used in deciding whether to grant summary judgment on Herrera's claims. [Doc. 13.] On February 20, 2002, Defendants submitted the Martinez report [Doc. 15]. Duran did not file a response, even though the Order directing submission of a Martinez Report informed Herrera that he had thirty days to do so from the date of service of the Report. [Doc. 13]. The matter is now ripe for resolution on summary judgment.

The Court may grant summary judgment, under Rule 56(c) of the Federal Rules of Civil Procedure, if the pleadings, depositions, answers to interrogatories and admissions or affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The opposing party must be given notice and an opportunity to respond, as provided in Rule 56. Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991).

Defendants, having filed a Martinez Report, are in the same position as a movant for summary judgment and therefore, carry the burden of establishing that there is no genuine issue of material fact

---

[2]The Court may order the defendant in a case brought by a prisoner proceeding *pro se* to submit a special report referred to as a Martinez Report. The report is an investigation of the incident which is the basis of the lawsuit. *See* Martinez v. Aaron, 570 F.2d 317 (10th Cir. 1978).

for trial. Defendants may satisfy its burden by showing an absence of evidence to support Herrera's case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986). Once the movant meets its burden, the burden shifts to the plaintiff to demonstrate a genuine issue for trial on a material matter. <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991). The party opposing the motion may not rest on pleadings, mere argument, or contention but must set forth specific facts through admissible evidence, showing there is a genuine issue for trial as to those dispositive matters for which he carries the burden of proof. If he cannot make such a showing, summary judgment is appropriate. <u>Celotex</u>, 477 U.S. at 324.

It is undisputed that Defendants permitted Herrera to have some extended, unsupervised visits with his three minor sons prior to June 2001, and that since June 2001, they have denied this type of visit to Herrera. It also is uncontested that Herrera may have regular or "contact" visits with his minor sons and that he may have "family visits" with adult relatives (in accordance with eligibility requirements of GCCF). The only change in family visitation privileges for Herrera is that he may not have extended, unsupervised visits with minor children because of the nature of his conviction, which included criminal sexual penetration of a 17 year old female.

The Court is concerned with Defendants' unexplained change in practice towards Herrera's family visits in June 2001, particularly because there do not appear to have been any policy revisions to account for this change at that time and also because there is no evidence that Herrera or his visitors previously violated GCCF's regulations or rules during a family visit. However, after carefully considering the pertinent law, pleadings and exhibits, and the Martinez Report, the Court finds that Herrera has not demonstrated a genuine issue of material fact to show that the decision to alter or reduce his visitation privileges with his minor sons constitutes a constitutional violation, under

due process, the Fourth Amendment, Eighth Amendment or Fourteenth Amendment. In addition, there is no genuine issue of material fact for trial with respect to Herrera's conspiracy or state tort claims. Therefore, summary judgment in favor of Defendants is appropriate, and Herrera's complaint will be dismissed with prejudice.

## **Factual Background**

On about April 10, 1992, Herrera was arrested and charged with two counts of criminal sexual penetration of a young woman, aged 17-year, kidnapping and burglary. [Doc. 15, Ex. 1.] According to the police reports attached to the Martinez Report, Herrera gave a statement admitting that "he did it." [Id., Ex. 1, p. 5.] In May 1994, a jury convicted Herrera of criminal sexual penetration under NMSA 1978 30-9-11(A) and (B).[3] He was sentenced to a total period of incarceration of 24 years. [Id., Ex. 2.] Apparently after he was convicted, the state court judge ordered a diagnostic evaluation of Herrera to determine what was in the best interests of Herrera and society. [Id., Ex. 3.] The results of the evaluation included a recommendation for incarceration and "individual therapy for his personality disorder," and drug and alcohol treatment. The recommendation was based on Herrera's "lack of amenability to treatment and criminal character structure." [Id.]

After his conviction, but prior to January 1999, Herrera was incarcerated at facilities other than GCCF and apparently was permitted unsupervised visits with his minor sons for five to seven years, although there is no documentation to confirm these visits. [Doc. 1, ¶ 11.] On about January 21, 1999, Herrera was transferred to GCCF. [Doc. 15, Ex. 4.]

---

[3] Paragraphs (A) and (B) of NMSA 1978 § 30-9-11 do not refer to the age of the victim. Section 30-9-11(C)(1) defines first degree criminal sexual penetration ("CSP"), in part, as perpetrated on a child under 13 years old. Second degree CSP is perpetrated on a child from age 13 to 16 years old. NMSA 1978 § 30-9-11(D)(1). Herrera argues that he was not actually convicted of CSP *of a minor*. It is not clear from the state court judgment and sentence, and the applicable statutes, that Herrera was convicted of CSP of a minor. It apparently is uncontested, however, that the underlying crime involved a 17-year old girl. [Doc. 15, Ex. 1.]

***CD and GCCF Policies Regarding Visits***:

GCCF follows both its own policies in addition to the New Mexico State Corrections Department ("CD") policies regarding inmate visitation. In January 1999, the general visiting policy, issued by CD (CD-100200), provided in pertinent part that each New Mexico Corrections Facility promulgate a visiting policy "appropriate to its security needs . . . ." [Doc. 15, Ex. 13, VI(A).] That policy also set out that each facility "shall provide a visiting program designed to enhance the inmates' opportunities to establish or maintain family and personal relationships . . . ." [Id., Ex. 13, VI(B).] In addition, the individual facility's policy shall include security measures designed to safeguard visitors, staff and inmates and maintain institutional security, including measures used to approve visitors. [Id., Ex. 13, VI(D).] According to the CD policy, inmates must submit applications for visitors and meet certain criteria.

In 1984, the CD issued a policy specific to "family visits" (CD-100100) [Doc. 15, Ex. 14.] The policy defined the family visit as "an extended visit between eligible inmates and their families." [Id., Ex. 14, V(B).] The underlying purpose for family visits is: "to promote family stability, encourage participation in programming and enhance the reintegration/rehabilitation process." [Id., VI(A).] Under eligibility criteria, the CD policy provides that any inmate "convicted of a crime involving . . . criminal sexual penetration, . . . toward a family member or an individual with whom the inmate has had a significant relationship will not be eligible for a family visit with the victim of that crime." These criteria do not appear to apply to Herrera, whose crime was not perpetrated on a family member or someone with whom he had a "significant relationship." However, the CD policy goes on to state:

> The Warden may also disapprove the visit if there is reason to believe the proposed visit would create a risk of harm or danger to the visitor or staff or otherwise endanger the security of the institution, or if there is a legitimate penological reason to deny the visit.

[Id., Ex. 14, II(A)(1)(b).]

The above cited portions of these CD policies appear to have been in effect when Herrera was both approved for family visits with his children and later denied family visits with minors. In other words, these portions of the CD policies were not revised between 1999 and June 2001.

GCCF also established policies regarding visitation and family visits. In March 1999, GCCF promulgated policy number 21.003 regarding regular and/or "contact visits." [Doc. 15, Ex. 15.] That policy provides that all visitation will be contact visits unless precluded as a result of security reasons. During a contact visit, the inmate can embrace and kiss the visitor once at the beginning and end of the visit. The inmate and visitor sit across from each other at a table. The inmate may hold his children. Non-contact visits prohibit any physical contact. [Id., p. 1.]

Under GCCF's contact visit policy, if an inmate was convicted and sentenced for crimes "involving sexual offenses against children," he or she may be restricted from having contact visits with children under the age of 16, "at the discretion of the Warden." "This restriction will be imposed only in the interests of visitor's safety and the security of the facility to ensure criminal acts against children which are of a sexual nature do not occur during contact visitation." [Id., Ex. 15, ¶(A)(2)[4](f).] This policy also provides that the warden or designee can deny visits if "it is believed that a visit . . . will compromise the safety and security of staff, inmate, or the institution." [Id., Ex. 15, ¶ B(4)(a).] Thus, GCCF has the discretion under this policy to deny Herrera contact visits with

---

[4]The reference to subparagraph 2 is to the first of two paragraphs in the policy identified as "2".

his minor sons, essentially for the same reason(s) he was denied family visits with them. (*See* discussion *infra*.)

GCCF revised policy 21.003 on a number of occasions but does not appear to have made any changes to the above cited portions between March 1999 and June 2001. [*See* Doc. 15, Exs. 15, 20, 21, 22, 24, 26.]

On March 2, 1999,[5] GCCF enacted policy number 14.011, that is specific to family visits. Similar to CD's policy, GCCF defined a family visit as an extended visit between eligible inmates and their families. The GCCF policy included the same policy statement set forth in CD's policy. The GCCF policy, like the similar CD policy, provides that family visits will be denied to an inmate convicted of CSP or any other crime resulting in serious bodily injury toward a family member or an individual with whom the inmate had a significant relationship. It appears that in March or December 1999, policy 14.011 was revised to provide that the warden could deny a visit based on a legitimate penological interest and/or if it was believed the visit would create a risk of harm or danger to those involved.

On November 27, 2001, about five months after Herrera was first denied a family visit with his sons, GCCF revised policy 14.011 to state that "[i]f the crime was sexual in nature children will not be allowed in the family visits." [Doc. 15, Ex. 32, ¶ A(eligibility requirements)(1)(b).] Thus, under the later revised version of this policy, Herrera is automatically denied a family visit with his minor sons even if the conviction for CSP did not involve a minor.

---

[5]The actual policy attached by GCCF shows a revision date of 12/6/99 but does not indicate when the policy was first issued. GCCF argues, however, that it was on March 2, 1999.

### *Herrera's Family Visits at GCCF*:

On June 24, 1999, Herrera submitted his first application at GCCF[6] for a family visit with his three minor sons who were ages 7, 8 and 10. [Id., Ex. 8.] The family visit also was to include Herrera's mother, sister and 1 year old niece. The GCCF classification officer approved the visit. The psychologist noted that Herrera would benefit emotionally from family visits, that he was very close to his children and that the visits facilitated family cohesion and stability.[7] [Id., Ex. 9.] Herrera received a family visit with these relatives on July 10, 1999.

On June 17, 2000, Herrera submitted another application for a family visit, with his three sons, mother and sister. [Id., Ex. 10.] A different classification officer approved the visit, and the psychologist wrote "no contradictions (current) for family visit from Mental Health perspective. [Id.] He received a family visit on July 14, 2000.

On September 16, 2000, Herrera again applied and was approved for a family visit with his three sons, mother and sister. [Id., Ex. 11.] The family visit took place on October 27, 2000. The last family visit for which Herrera applied and was approved took place on January 12, 2001. [Id., Ex. 12.] The reports and attachments provided by Defendants do not indicate that any problems

---

[6]The 6-month delay in Herrera's request may be explained by CD or GCCF rules and regulations that require an inmate to have been incarcerated at the institution of application for a certain period of time before becoming eligible for a family visit. [*See* Doc. 15, Ex. 14.]

[7]According to the pertinent CD rules and regulations, a psychological evaluation of an inmate "may be required" and is recommended in cases where there is a history of violence or instability. [CD-100101(B)(4), Ex. 14 to Doc. 15.] The fact that Herrera was given a psychological evaluation in relation to his requests for family visits might imply that the case manager was aware of his prior conviction and yet still decided he met the criteria for eligibility.

arose with Herrera during or because of these family visits. Later visits appear to have lasted 12 hours and were scheduled from 8:30 a.m. until 8:30 that evening.[8] [Id., Exs. 10, 12.]

On May 8, 2001, Herrera applied for a family visit with his sons, mother and sister. Herrera's new case manager, Paula Haight, approved the request as to "adults only." [Id., Exs. 5 and 6.] In a memorandum from Ms. Haight, she notes that no children would be allowed during Herrera's family visit "due to Inmate's sentence." [Id., Ex. 6.] Other attached documents from Defendants indicate that this restriction was "per CD Policy-I/M not allowed to have visit w/ child. due to charge." [Id.] The family visit check list documents that Herrera had no current or previous disciplinary record in the last 12 months and had not tested positive on a urinalysis. [Id.] This same form contains a check mark next to CSP with a minor. When informed of this restriction, Herrera supposedly said he "did not want the visit then" and that if GCCF wanted "to play hard ball he could do that." [Id., Ex. 6.]

Haight's supervisor, Janet Bravo, assigned Ms. Haight to Herrera in May 2001. [Id., Ex. 37.] Bravo stated in an affidavit that Haight reviewed Herrera's file and noticed that he had been convicted of a sexual offense involving a minor. Based on GCCF policies that did not permit inmates (with such convictions) to have family visits with a minor, Haight determined that Herrera did not qualify for the family visit with his sons. [Id.] Bravo approved this decision, and claims that when Herrera was informed of the restriction, he made threats to kill Bravo in a violent manner. [Id.] After these threats, Herrera was transferred to a mental health facility. [Id.]

---

[8]CD rules and regulations provide for progressive family visitations. Phase I permits qualified inmates to apply for one six-hour family visit. Successful completion of two Phase I family visits permits inmates to apply for a Phase II family visit that consists of a 12-hour family visit. Successful completion of four Phase II visits permits the inmate to apply for a 24-hour family visit, if they are within one year of a projected release or discharge date. [CD-100101(B)(8), Ex. 14 to Doc. 13.] Herrera clearly must have successfully completed Phase I and was mid-way to completing Phase II visits.

### _Herrera's Grievance:_

On June 12, 2001, Herrera filed a grievance regarding the denial of the family visit with his sons. In the grievance, Herrera stated that he was not challenging the "classification process, just against the application, adherence, and correct usage of CD-100101." [Doc. 15, Ex. 7.] Herrera's grievance was denied, based on information from Haight that she was merely following directives from her supervisor Bravo who told her an inmate with charges of CSP of a minor was not allowed to have a family visit with a child. [Doc. 15, Ex. 7.] Warden Griego concurred with the recommendation to deny Herrera's grievance. [Doc. 15, p. 12.]

On June 28, 2001, Herrera appealed the denial of his grievance and argued that he was not convicted of CSP of a minor. Instead, the CSP charge "was elevated due to the mental anguish factor present during testimony from a clinical psychologist . . ." [Id.] Herrera asserted that he was not convicted of CSP with a family member, that his children were not his victims, and that he had mental health clearance for the family visit. He also claimed that he had a seven year history of successful visits during his confinement. [Id.] On January 23, 2002, John Shanks, Deputy Secretary of Operations denied the appeal. Shanks found that Haight had reviewed Herrera's file and concluded that he was charged and found guilty of CSP of a 17 year old girl, which precluded him from having family visits with minors.[9]

---

[9]Defendants argue that Herrera failed to exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a) because he filed this lawsuit on July 6, 2001 before the Department of Corrections denied his appeal in October 2001. Therefore, Defendants assert that this lawsuit should be dismissed for failure to exhaust. The PLRA does require exhaustion; however, any dismissal of Herrera's claims would be without prejudice to permit him to exhaust his administrative remedies. _See_ Yousef v. Reno, 254 F.3d 1214, 1222-23 (10th Cir. 2001) (remanding case to district court with instructions to dismiss claim without prejudice to allow for exhaustion). Here, Herrera's appeal has been decided, and there is no point in dismissing this case without prejudice to require exhaustion.

***Herrera's Regular or Contact Visits:***

GCCF visitor logs between August 20, 2000 and October 10, 2001 indicate that Herrera received a number of regular or contact visits with his mother and sister, and a few regular or contact visits with his sons and niece. [Id., Ex. 36.] There is no evidence to show that Herrera was denied regular or contact visits with his sons. It appears that Herrera has refused to consider or request many regular or contact visits with his sons after being denied family visits with them.

## Discussion

## I. ALLEGED VIOLATION OF DUE PROCESS RIGHTS AND/OR LIBERTY INTERESTS

Count I of Herrera's Complaint alleges violations of procedural and substantive due process under the Fourteenth Amendment, as well as liberty interest infringements.[10] Herrera asserts that Defendants violated his rights by denying him family visits with his sons and by approving or implementing the policy language that led to the denial of these family visits. [Doc. 1.]

Defendants argue generally that Herrera has not been denied regular or contact visits with his sons, and further, that the decision to terminate family visits between Herrera and his sons was in accordance with "rules and policies allowing GCCF to forbid a convicted sex offender involving a minor from having unsupervised visits with minors." As stated *supra*, it is not entirely clear from the state court judgment and sentence and applicable state statute that Herrera was convicted of CSP of a minor. In addition, it is a slight stretch to imply that the policies in effect in June 2001 allowed the GCCF to forbid a convicted sex offender, like Herrera, from having unsupervised visits with minors. The language referred to in the policies narrows that restriction to crimes involving family members

---

[10]To the extent that Herrera asserts companion claims under the New Mexico State Constitution (*see* Complaint at ¶ 25), those claims are dismissed for the same reasons discussed in the body of this opinion.

and or individuals with whom the offender had a significant relationship, factors that are not present in Herrera's situation.

Other language in the applicable policy, however, certainly provides GCCF with the discretion to deny family visits when there are safety issues or when there is a legitimate penological reason to deny the visit. But it strains credulity for Defendants to say that these family visits with Herrera's young sons that were previously approved by several case managers and psychologists, and that had already taken place on four occasions at GCCF, suddenly, in June 2001, presented dangers or safety issues and/or that a legitimate penological interest precluded them.[11] It is far from clear why GCCF changed its practice towards Herrera in June 2001, particularly because the written policies in effect had not changed as of that date and there is no documentation of any disciplinary issues with Herrera before the denial of his family visits to explain GCCF's rejection of his request. An abrupt and apparently unwarranted change in Defendants' family visitation privileges hardly serves legitimate penological interests. To the contrary, it surely drives a wedge between an inmate and his most precious source of familial support. From the Court's perspective, this policy change was imprudent and counterproductive. Nonetheless, the Court cannot second-guess GCCF's reasons for the decision. Swepston v. Hargett, 124 F.3d 217 (Table, Text in Westlaw), 1997 WL 545574 at *2 (10th Cir. Sept. 4, 1997) (court "must defer to front-line expertise of those responsible for the safety and security of our prisons") (citing Mitchell v. Maynard, 80 F.3d 1433, 1443 (10th Cir. 1996)). See also

---

[11]Indeed, this unexplained change by GCCF seems to run counter to the underlying policy of permitting family visits, i.e., to promote family stability, encourage participation in programming and enhance the reintegra-tion/rehabilitation process. While the Court does not approve of Herrera's response to being denied family visits with his son, particularly if he threatened corrections officers' lives, documentation of his behavior before being denied the visits seems to reflect that the program may well have been meeting the underlying goals.

Bell v. Wolfish, 441 U.S. 520, 545-46, 99 S.Ct. 1861, 1877 (1979) (fact that inmates retain certain constitutional rights does not mean that those rights are without restrictions and limitations).

I need not decide the question of whether inmates have a general constitutional right to receive visits from family and friends because Herrera has not been denied **all** visits with his family or children. It is worth noting, however, that courts have reached different results in answering this broader inquiry. *See* Ramos v. Lamm, 639 F.2d 559, 579, 580 n. 26 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759 (1981) (not reaching this exact question but deciding that there is no constitutional right to *contact* visitation and discussing pertinent court decisions).

The Fifth, Sixth and Eleventh Circuits, for example, have held that convicted prisoners have no absolute constitutional right to visitation with family members. Lynott v. Henderson, 610 F.2d 340, 342 (5th Cir. 1980); Bellamy v. Bradley, 729 F.2d 416, 420 (6th Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 156 (1984); Evans v. Johnson, 808 F.2d 1427 (11th Cir. 1987). In reaching this decision, courts reason that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a reaction justified by the considerations underlying our penal system." Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125, 97 S.Ct. 2532, 2537 (1977) (internal citation omitted); Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974). Conviction of a crime deprives inmates of the freedom "to be with family and friends and form the other enduring attachments of normal life." Morrissey v. Brewer, 408 U.S. 471, 482, 92 S.Ct. 2593, 2600 (1972). However, it also is recognized that "incarceration does not divest prisoners of all constitutional protections." Shaw v. Murphy, 532 U.S. 223, 228, 121 S.Ct. 1475 (2001); Beerheide v. Suthers, __ F.3d __, 2002 WL 535836 at *3 (10th Cir. Apr. 11, 2002).

Similarly, due process does not guarantee inmates an interest or right to unfettered visitation. Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908 (1989). "The denial of prison access to a particular visitor 'is well within the terms of confinement ordinarily contemplated by a prison sentence,' and therefore, is not independently protected by the Due Process Clause." Id. at 461, 109 S.Ct. at 1909 (internal citations omitted).

Even if there were a constitutional right to visitation, "limitations upon visitation may be imposed if they are necessary to meet penological objectives such as the rehabilitation and the maintenance of security and order." Bellamy, 729 F.2d at 420.

> When an institutional restriction infringes on a specific constitutional right, the prison policy must be evaluated in light of the legitimate objectives of penal administration-security, order and rehabilitation. And when the policy in question involves the entry of people into the prison for face-to-face contact with inmates, security and related administrative considerations are sufficiently paramount to justify the imposition of some restrictions on such visits. Because the running of a penal institution is both complex and difficult, prison administrators are to be 'accorded wide-ranging deference' in adopting and executing policies and practices which, in their judgment, are necessary to preserve internal order and discipline and to maintain institutional security.

Ramos, 639 F.2d at 579 (internal citations omitted). "The deference given to prison officials 'is at its height when the prison regulations at issue involve security and safety concerns." Salas v. Skon, 1998 WL 665121 at *3 (Minn. App. Sept. 29, 1998) (internal citations omitted). Moreover, protecting visitors from potential harm by inmates is a valid penological goal. Block v. Rutherford, 468 U.S. 576, 586-87, 104 S.Ct. 3227 (1984).

This case is factually similar Salas v. Skon, which although not binding, is instructive. In Salas, the plaintiff had a number of prior convictions for criminal sexual conduct and all his victims

were minors.  Because of his convictions, prison policy did not permit him visits with victims or minors.  However, due to a clerical error, he was allowed visits from minors at one point and then the error was corrected apparently.  1998 WL 665121 at *1.  He brought a § 1983 action against prison officials under the U.S. Constitution and the Minnesota Constitution, asserting that the prohibition from visitation with his three minor children was unconstitutional.

The Minnesota Court of Appeals first noted that parents have a substantial and fundamental right in the care and companionship of their children.  Id. at *2.  However, incarceration brings along with it necessary restrictions on an individual's rights and privileges.  The Court analyzed whether the prison regulation in question was reasonably related to legitimate penological interests.  There are four factors relevant to this inquiry:

> First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it.  Second, the court must consider 'whether there are alternative means of exercising the right that remain open to prison inmates,' giving deference to the judgment of correction officials.  Third, the court must evaluate how accommodation of the right will impact guards, inmates, and resources at the prison, again giving deference to correction officials.  Finally, the court must determine whether 'ready alternatives' exist or whether the regulation is instead an 'exaggerated response' to prison concerns.

Id. (citing Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261 (1987)).  The Salas Court concluded that all of these factors were satisfied.  The prison had a legitimate interest in ensuring that children on family visits were not exposed to sexual or physical abuse.  The inmate had alternative means available to maintain his relationship with his children, including telephone and mail contact.  Salas was given and not denied the opportunity to arrange for supervised visitation with his children.  Further, to allow Salas the types of visits he wanted would burden the prison since it could expect

the same demands from other inmates. The facility did not have economically feasible "ready alternatives" to the type of regulation it employed. Therefore, Salas' claims of substantive due process were properly dismissed. Id. at *3.

The Salas Court also analyzed the claim of whether the inmate had a protected liberty interest that was violated. "Protected liberty interests 'may arise from two sources – the Due Process Clause itself and the laws of the States.'" 1998 WL 665121 at *4 (internal citation omitted). The Court first determined that the United States Constitution did not provide Salas with a due process liberty interest. Id. The Court then found that while states may under certain circumstances create liberty interests that are protected under the Due Process Clause, such interests "will be generally limited to freedom from restraint which . . . impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. (citing Sandin v. Connor, 515 U.S. 472, 483-84, 115 S.Ct. 2293, 2300 (1995)). Restrictions on Salas' visitation were a necessary consequence of incarceration. Therefore, the limitation of visitation with his minor children did not create an atypical, significant deprivation, and the claim was properly dismissed. Id.

In Harrison v. Barbour, the plaintiff similarly claimed he was deprived of due process because his extended family visitation privileges were terminated. Harrison v. Barbour, 98 F.3d 1345 (Table, Text in Westlaw), 1996 WL 570396 at *1 (9th Cir. 1996), cert. denied, 520 U.S. 1243, 117 S.Ct. 1850 (1997). In that case, the prison revised the visitation program after a stabbing occurred in the trailer during an extended visit. The revision barred any inmate with a history of domestic violence from participating in the extended visitation program. Harrison argued, among other things, that he had a state-created liberty interest in continued participation in the program. Id. The Ninth Circuit

noted that he was wise not to argue he had a constitutional right to extended visitation since none existed.  Id. n. 1.

In deciding this question, the Harrison Court explained that under Sandin, the relevant inquiry was whether the prison regulations imposed "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Id.  Similar to the Salas Court, the Ninth Circuit rejected Harrison's claim reasoning that extended visitation privileges are not "ordinary incidents of prison life."  Id.  See also Billups v. Galassi, 202 F.3d 272 (Table, Text in Westlaw), 2000 WL 6200 at *1) (holding that restriction on visitation privileges did not implicate a constitutionally protected liberty interest, and that therefore, no hearing or other due process protection was required).  But see Bazzetta v. McGinnis, __ F.3d __, 2002 WL 529956 (6th Cir. Apr. 10, 2002) (analyzing permanent bans on visitors in terms of First Amendment and Eighth Amendment claims).

Here, Herrera has not been denied all family visits or all visitation privileges with his children. He clearly does not have a due process right under the Fourteenth Amendment to unrestricted visitations or to visitations of his choice.  Kentucky Dep't of Corrections, 490 U.S. at 460, 109 S.Ct. 1904.  Even if he did, the modification of his privileges, as contrasted with the removal of all family visitation privileges, simply does not amount to a constitutional violation.

Moreover, consistent with the four-part test set out in Turner v. Safley, 482 U.S. at 89, 107 S.Ct. at 2261 and with its application in Salas, the regulations and their execution by GCCF are reasonably related to legitimate penological interests.  For example, GCCF has a legitimate interest in ensuring that minor children on unsupervised family visits are not exposed to sexual or physical

abuse.  Herrera has other means to maintain contact with his children and is encouraged to do so.[12]

He is permitted contact visits with his children, and according to prison regulations he can hold them.

during visits.  Similar to the situation in <u>Salas</u>, if Herrera were permitted unsupervised visits with his

children, a "ripple effect" might result where GCCF would face the same demands from other

inmates, thereby burdening the system.  In addition, there is no evidence that GCCF has economically

feasible "ready alternatives" to the type of regulation it employed.

To the extent that Herrera only challenges the execution or application of the regulations, this

argument also must fail.  Under the express language of its policies, GCCF is provided with the

authority and discretion to deny visits in the interests of security and safety.  These are legitimate

penological interests.  Based on Herrera's conviction for criminal sexual penetration with a 17-year

old, the record fails to conclusively raise a genuine issue of fact to show that the prison officials were

wrong in denying unsupervised, extended visits with his minor children based on safety concerns of

his minor children.  This is particularly true given the high level of deference owed to corrections

administrators in the maintenance of prison security and safety.  <u>Bell v. Wolfish</u>, 441 U.S. at 547, 99

S.Ct. at 1878.  Therefore, Herrera's due process claim must be dismissed as a matter of law.

Similarly, any claim by Herrera that he had a state-created liberty interest in family visitation

with his children must fail.  Such an interest only exists when the loss of the interest is an "atypical"

sanction that imposes "significant hardship on the inmate in relation to the ordinary incidents of prison

life." <u>Sandin</u>, 115 S.Ct. at 2300.  The sanction of restricting visitation privileges is not atypical as the

GCCF and CD regulations expressly envision limitations on such privileges. *See* <u>Kentucky</u>, 490 U.S.

---

[12]While Herrera may think he is "playing hardball" with GCCF by refusing to arrange for contact visits
with his sons, only his family relations may suffer in the end.

at 464, 109 S.Ct. 1904 ("overall effect of the [visitation] regulation is not such that an inmate can reasonably form an objective expectation that a visit would necessarily be allowed absent the occurrence of one of the listed [criteria]"). Moreover, family visits that are unsupervised and extended are not considered "ordinary incidents of prison life" because the denial of visitation is well within the terms of confinement ordinarily contemplated by a prison sentence. Id., 490 U.S. at 461, 109 S.Ct. at 1909. Indeed, to be deprived of family visits in the prison setting is no different than what large numbers of other inmates customarily experience. Cooper v. Garcia, 55 F. Supp. 2d 1090, 1100 (S.D. Cal. 1999).

Despite the Court's concerns about GCCF's change in practice towards Herrera's family visits with his sons, Defendants are correct that these modifications of Herrera's family visitation privileges do not amount to violations of Herrera's due process rights. *See* Cooper, 55 F. Supp. 2d at 1100 (court was sympathetic to the inmate's plight since he was denied family visits based on his sex offender classification, when he was never convicted of a sex offense; however, federal courts are not authorized to second-guess the policies of prison administrators). Therefore, Herrera's due process and liberty interest claims will be dismissed.

## II.    ALLEGED VIOLATIONS OF EQUAL PROTECTION RIGHTS

Herrera claims that GCCF treated him "differently from other prisoners" and "more harshly than other prisoners." [Doc. 1, ¶ 42.] Herrera provides no further detail or breakdown of inmates who may have been treated more favorably than he.

"The Equal Protection Clause requires that no state 'deny to any person within its jurisdiction the equal protection of the laws.' A violation of equal protection occurs when the government treats someone differently than another who is similarly situated." Jacobs, Visconsi & Jacobs, Co. v. City

19

of Lawrence, Kansas, 927 F. 2d 1111, 1118 (10th Cir. 1991) (*citing* U.S. Const. Amend. XIV) (other internal citations omitted)). An equal protection will fail if the petitioner fails to show that he was being treated differently from "similarly situated" prisoners. Fraley v. United States Bureau of Prisons, 1 F.3d 924, 926 (9th Cir. 1993). If "a plaintiff does not allege a violation of a fundamental right or the existence of a suspect classification, prison officials need only show that their policies bear a rational relation to a legitimate penological interest in order to satisfy the equal protection clause." Smith v. Wood, 122 F.3d 1073 (Table, Text in Westlaw), 1997 WL 556323 at *1 (9th Cir. Aug. 29, 1997).

As discussed at length *supra*, the Court has determined that Herrera has not alleged a violation of a fundamental right with respect to GCCF's modification of his family visitation privileges. In short, the family visitation privilege (supervised, extended visits) is just that – a privilege, rather than a constitutionally protected right. Secondly, Herrera failed to demonstrate the existence of a suspect classification and/or to identify similarly situated prisoners who were treated more favorably. Accordingly, GCCF need only show that their policies were rationally related to legitimate penological interest. As discussed fully, GCCF has satisfied this portion of the inquiry. Therefore, Herrera's equal protection claim will be dismissed.

### III.   ALLEGED VIOLATIONS OF EIGHTH AMENDMENT RIGHTS

The Eighth Amendment protects inmates from disproportionate and cruel conditions of confinement. U.S. Const. Amts. VIII, XIV; Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285 (1976). The Eighth Amendment may be violated when conditions are found to "involve the unnecessary and wanton infliction of pain," even though not found physically barbarous. Navin v. Iowa Dep't of Corrections, 843 F. Supp. 500, 504 (D. Iowa 1994) (*citing* Rhodes v. Chapman, 452

U.S. 337, 346, 101 S.Ct. 2392, 2399 (1981)).  "Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification,' and which may involve either mental or physical pain."  Id. (internal citations omitted).  A prison official's actions violate the Eighth Amendment when (1) they are 'sufficiently serious' to deprive an inmate of the 'minimal civilized measures of life's necessities,' and (2) the official knows of and disregards the significant risk they pose to an inmate's health and safety."  Bazzetta, 2002 WL 529956 at *8 (internal citations omitted).

In Navin, the plaintiff alleged that corrections officials violated his constitutional rights by allowing his 9 year old daughter only one, one-hour visit with him over a period of one year.  843 F.Supp. at 504-05.  Prison regulations required that a minor be accompanied by a parent or legal guardian, etc.  The Court analyzed whether the restrictions on visitation by the inmate's minor child were reasonably related to legitimate penological interests and concluded that the prison's restrictions met the requirements of the four-part Turner inquiry.

This Court will not repeat the analysis yet again.  Suffice it to say that for the same reasons set forth *supra*, GCCF's restrictions and application of its policy were reasonably related to legitimate penological interests.  In contrast to the circumstances in Bazzetta v. McGinnis, where the Sixth Circuit agreed that depriving an inmate ***all visitors for an indefinite period*** was an extremely harsh

measure violative of the Eighth Amendment,[13] Herrera is not deprived of all visits with his children.

Bazzetta, 2002 WL 529956 at *8. Therefore, the Eighth Amendment claim will be dismissed.

## IV.    ALLEGED VIOLATIONS OF FOURTH AMENDMENT RIGHTS

Herrera contends that GCCF's denial of family visits with his minor children is an unreasonable search and seizure and a denial of his privacy and personal rights.  [Doc. 1, ¶¶ 31, 33.] The Fourth Amendment protects individuals from "unreasonable searches and seizures."  U.S. Const. Amend. IV.  A Fourth Amendment violation requires a showing of an intentional acquisition of physical control.  Childress v. City of Arapaho, Okla., 210 F.3d 1154, 1156 (10th Cir. 2000).  "A seizure occurs even when an unintended person or thing is the object of the detention or taking . . ." Id.

Here, there is no authority to support the proposition that the reduction of family visitation privileges could constitute an unreasonable or unlawful "taking" under the Fourth Amendment. However, even if there were such authority, again the question would boil down to whether GCCF had a legitimate penological reason for reducing Herrera's family visitation privileges. As stated previously, GCCF satisfied that inquiry.  Therefore, the Fourth Amendment claim will be dismissed.

---

[13]The Court notes strong language in Bazzetta stating that to remove visitation (entire visitation) removes "the single most important factor in stabilizing a prisoner's mental health, encouraging a positive adjustment to . . . incarceration, and supporting a prisoner's successful return to society.  It 'goes to the essence of what it means to be human; it destroys the social, emotional, and physical bonds of parent and child, . . . , body and soul.  Nothing could be more fundamental."  Even in Navin, where the Court rejected the Eighth Amendment claim, the Court stated that it hoped "further compassionate review will cause the [correctional facility] to continue to restructure visitation by minors to suit the benefits of such visitation identified at the beginning of this section."  Navin, 843 F. Supp. at 505.  The referenced section addresses the rehabilitative benefits of visitation with one's children.  Id. at 503.

## V.    ALLEGED CONSPIRACY

Herrera generally alleges that Defendants met, conversed, planned and arranged a conspiracy to deprive him of constitutional rights and/or liberty interests.  [Doc. 1, ¶¶ 49-50.]  Without more, the conspiracy claim under 42 U.S.C. §§ 1985 and 1986 must fail.

> Section 1985 creates a cause of action against a party conspiring to deprive any person of equal protection of the law or the privileges and immunities of citizenship.  To state a claim, plaintiff must plead 1) a conspiracy (2) for the purpose of depriving any person or class of persons of equal privileges and immunities under the laws, and 3) an act in furtherance of the conspiracy 4) whereby a person or his property is injured or he is deprived of any right or privilege of citizenship.

McGregor v. City of Olathe, Kansas, 158 F. Supp. 2d 1225, 1239 (D. Kan. 2001), *aff'd*, 30 Fed. Appx. 811 (10th Cir. 2002).

Like McGregor, Herrera has not adequately alleged a conspiracy and fails to present evidence to create a genuine issue of material fact showing that a conspiracy existed.  Instead, Herrera appears to have used boilerplate language and set forth conclusory assertions.  Conclusory allegations of conspiracy are insufficient to state a claim.  Id.  Herrera's failure to provide specific facts showing an agreement and concerted action defeat the § 1985 conspiracy claim.  By definition, the § 1986 claim falls with the § 1985 claim.  Strepka v. Miller, 28 Fed. Appx. 823, 2001 WL 1475058 at *4 (10th Cir. Nov. 21, 2001.)  Therefore, Herrera's conspiracy claims will be dismissed.

## VI.    ALLEGED INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Herrera must raise a genuine issue of material fact with respect to the following elements of a claim of intentional infliction of emotional distress:

> (1) the conduct in question was extreme and outrageous;  (2) the conduct of the defendant was intentional or in reckless disregard of

> the plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between the defendant's conduct and the claimant's mental distress.

Trujillo v. Northern Rio Arriba Electric Cooperative, Inc., 2002 NMSC 004, __ N.M. __, 41 P.3d 333, 342 (2001) (internal citation omitted). Extreme and outrageous conduct is defined as "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Id. (internal citation omitted). The trial court may determine as a threshold matter whether the conduct at issue meets this definition. Id. at 343.

Here, Herrera's allegations simply do not present a genuine issue of material fact for trial with respect to each element of this claim. Because restrictions on family visitations are considered routine during incarceration, a prison's decision to limit such visits cannot reasonably be considered extreme and outrageous conduct or utterly intolerable in a civilized society. Furthermore, Herrera has not presented facts that tend to show that Defendants intended to cause him emotional distress.

For these reasons, the intentional infliction claim will be dismissed.

### Conclusion

Summary judgment should be entered in favor of Defendants because there is no genuine issue of material fact for trial. The order directing submission of a Martinez Report [Doc. 13] gave the parties notice that the Report might be used in deciding whether to grant summary judgment on Duran's claims. See Durtsche v. American Colloid Co., 958 F.2d 1007, 1009 n.1 (10th Cir. 1992) ("district courts are widely acknowledged to possess the power to enter summary judgment sua sponte") (quoting Celotex, 477 U.S. at 326). The Court finds that Herrera has not raised a genuine

issue of material fact with respect to any of his constitutional or state law claims related to the modification of family visits.

## Recommended Disposition

That summary judgment be entered in favor of Defendants and that Herrera's Complaint be dismissed, with prejudice.


_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge